**UNITED STATES of America,**
**Plaintiff,**

v.

**Edward G. NOVOTNY, in his individual capacity as Trustee of Midwest Limited and as Trustee of Sunrise Investments, Etta B. Novotny, and State of Colorado, Department of Revenue, Defendants.**

**No. 99–D–2196.**

United States District Court,
D. Colorado.

Sept. 14, 2001.

Philip Blondin, August A. Imholtz III, U.S. Department of Justice, Tax Division, Washington, DC, for plaintiff.

Edward G. Novotny, Cortez, CO, pro se.

Etta B. Novotny, Cortez, CO, pro se.

Neil Tillquist, Attorney General's Office, Robert D. Clark, Attorney General's Office, Denver, CO, William Allan Cohan, William A. Cohan, P.C., San Diego, CA, for defendants.

## MEMORANDUM OPINION AND ORDER

COAN, United States Magistrate Judge.

This is an action by the United States to reduce outstanding federal tax assessments against Edward Novotny to judgment and to foreclose federal tax liens on certain real property, under 26 U.S.C. § 7401 and 7403. Jurisdiction exists under 26 U.S.C. § 7402 and 28 U.S.C. § 1340 and § 1345. The matters before the court are the United States Motion for Summary Judgment [originally filed on December 22, 2000],[1] and Defendants Midwest Limited and Sunrise Investments' Motion for Summary Judgment [filed September 28, 2000]. On June 11, 2001, the parties consented to final disposition of the motions by the undersigned magistrate judge under 28 U.S.C. 636(c). The court heard oral argument from the parties on June 11, 2001. The motions are ripe for disposition.

### I.

The United States ("Government") seeks to reduce outstanding federal tax assessments against Edward Novotny to judgment and to foreclose federal tax liens on seven parcels of real property titled to defendants Midwest Limited and Sunrise Investments. The United States has moved for summary judgment on those claims. Defendants Midwest Limited and Sunrise Investments (collectively referred to as "Trust defendants" or "Trusts") have filed a counterclaim against the United States, and cross claims against the other defendants, to quiet title to the seven parcels of real property at issue. The Trust defendants move for summary judgment on their counterclaim. Defendant Etta Novotny is the wife of Edward Novotny and is named as a defendant because she may have an interest in the property at issue. Etta Novotny has filed a counterclaim against the United States to quiet title to her interest, if any, in the subject properties. Defendant Colorado Department of Revenue has filed cross claims against the defendants seeking to foreclose upon its tax liens against the seven parcels of property to satisfy a judgment entered in Montezuma County District Court, Case No. 99–CV–202, in favor of the State of Colorado and against Edward Novotny for unpaid 1989 and 1990 Colorado income taxes, penalties and interest. The following material facts are undisputed, unless otherwise noted.

### A. Federal Tax Liens

Since 1957, defendant Edward Novotny ("Novotny") has operated a sole proprietorship, d/b/a Four Corners Auto Parts & Salvage, consisting of towing and auto mechanic services, and buying and selling used and wrecked vehicles and new and used auto parts in Cortez, Colorado. (Deposition of Edward Novotny ("Novotny Deposition"), pp. 28–29, 42–50; Etta Novotny Declaration, at PP1–2) In 1989, Novotny and his wife, Etta Novotny, decided that Novotny should scale back his business operation; they entered into an agreement with Copperstate Metals, Inc. to sell 2,600 vehicles as scrap metal. (Declaration of Etta Novotny, P 15)

Novotny did not file a federal income tax return or pay any federal income taxes in 1989, 1990 and 1991 and has not filed a tax return since 1980. (Novotny Deposition, pp. 201–202; Government's Exs. 11, 12, 13 and 15) Novotny does not believe he is required to pay federal income taxes. (Edward Novotny's Response to United

---

1. The United States originally filed the Motion for Summary Judgment on December 22, 2000. On January 3, 2001 the district judge ordered that the motion be stricken and granted leave to refile. The United States' Motion for Summary Judgment, as originally filed, was reinstated on January 19, 2001.

States Interrogatories, Government's Ex. 17, at p. 5)

The IRS conducted an audit concerning Novotny's failure to pay federal taxes for the years 1989 through 1991 and sent Notices of Deficiency for those tax years to Novotny. (Edward Novotny Response to Requests for Admissions, Government's Ex. 19, PP4, 6) The Government's Certificates of Assessments and Payments for Edward G. Novotny for the 1989, 1990 and 1991 tax years reflect that Novotny owes the Government $100,684 in unpaid federal income taxes, $31,890 in assessed statutory penalties, and interest for those tax years.[2] (Government's Exs. 11, 12 and 13) The tax assessments against Novotny for the 1989 and 1990 tax years were made on May 17, 1993. (Compl., P17; Government's Exs. 11 and 12) The tax assessment against Novotny for the 1991 tax year was made on November 14, 1994. (Compl., P17; Government's Ex. 13)

On June 23, 1993, acting under the authority of the Commissioner of Revenue, Internal Revenue Service ("IRS") agents recorded Notices of Federal Tax Liens in the Montezuma County, Colorado, Clerk and Recorder's Office, listing tax assessments made against Novotny for the 1989 and 1990 tax years, and naming several entities, including the defendants Sunrise Investments and Midwest Limited, as nominees, alter egos or transferees of Novotny with respect to the assessments against Novotny. (Compl., PP21–22 and Exs. 1 and 2; *admitted*, Trusts' Answer, PP21–22) On March 1, 1995, the IRS recorded a Notice of Federal Tax Lien in the Clerk and Recorder's Office of Montezuma County, Colorado, listing assessments made against Novotny for the 1991 tax year, and naming several entities, including the Trusts, as nominees, alter egos or

transferees of Novotny with respect to the assessments against Novotny. (Compl., PP23–24 and Exs. 3 and 4; *admitted*, Trusts' Answer, PP23–24)

B. *Transfers of Real Property to the Trusts*

The Novotnys purchased a package of domestic trusts from Wyoming promoter Lowell Anderson and created the Trusts on June 1, 1979. (Novotny Deposition, pp. 197–200, 469; Declaration of Etta Novotny, PP4–5) The Novotnys formed the Trusts for estate planning purposes to preserve assets for their children. (Novotny Deposition, pp. 197–200, 469; Deposition of Etta Novotny, p. 16; Declaration of Etta Novotny, P4) Each Trust was organized under the laws of Wyoming and contains the following provisions: the trustees have discretion to distribute any Trust income or proceeds; the trustees have discretion to pay all officers, agents and employees of the Trust; the Trust exists for twenty-five years unless the trustees unanimously change the date; when the Trust terminates, the Trust assets are liquidated and distributed to the existing certificate holders; the Trust property is held in fee simple by the trustees for the benefit of the certificate holders; and, the trustees, officers, agents or employees possess only such authority as awarded them in the Trust documents. (Contract and Declaration of Trust for Midwest Limited and for Sunrise Investments, attached to the defendant Trusts' Answer as Exhibits 2 and 3, at PP4, 5, 17, 24, 27, 29)

At the time the Trusts were created, each Trust issued 100 Trust Certificate Units ("TCUs"). (Etta Novotny Declaration, P6) On June 1, 1979, the Novotnys transferred title to the seven parcels of

---

**2.** The IRS has determined that, as of December 18, 2000, Novotny owed a total amount of $347,436.62 in unpaid federal taxes and inter-

est. (Declaration of Jane Trujillo, Revenue Officer, Government's Ex. 14)

real property to the defendant Trusts in exchange for $10.00 consideration for each parcel and fifty TCUs each. (Etta Novotny Declaration, PP6–7; Novotny Deposition, pp. 411–412) Parcels 1, 2, 4, 5, and 6 were conveyed to defendant Midwest Limited. (Compl. at PP26, 28, 32, 34 and 36 and Exs. 6, 8, 12, 14, and 16; *admitted,* Trusts' Answer, PP26, 28, 32, 34 and 36) Parcels 3 and 7 were conveyed to defendant Sunrise Investments. (Compl. at PP30, 38 and Exs. 10, 12, and 18; *admitted,* Trusts' Answer, PP30, 38) The deeds transferring the properties to the Trusts were recorded in the Montezuma County Clerk and Recorder's Office on August 3, 1979. (Compl., Exs. 6, 8, 10, 12, 14, 16 and 18)

Parcel 1, legally described in paragraph ten of the Complaint, consists of two vacant lots on the corner of Empire and Broadway in Cortez, Colorado. (Novotny Deposition, pp. 263–266). Title to Parcel 1 was conveyed to the Novotnys on February 3, 1977 for the stated consideration of $10. (Compl., P25 and Ex. 5; *admitted,* Trusts' Answer, P25) The documentary fee stamp applied when the deed was recorded indicates that the purchase price was $17,000. (*Id.*)

Parcel 2, legally described in paragraph eleven of the Complaint, consists of two commercial buildings located at 483 and 485 N. Broadway in Cortez, Colorado. (Novotny Deposition, p. 274) Title to Parcel 2 was conveyed to the Novotnys on November 18, 1977 for the stated consideration of $10. (Compl. P27 and Ex. 7; *admitted,* Trusts' Answer, P27) The documentary fee stamp applied when the deed was recorded indicates that the purchase price was $58,000. (*Id.*)

Parcel 3, legally described in paragraph twelve of the Complaint, consists of sixty-two acres of land located at 13106 U.S. Highway 666, Cortez, Colorado and contains the Novotnys' residence. (Novotny Deposition, p. 323) Title to Parcel 3 was conveyed to the Novotnys on September 15, 1956 for the stated consideration of $10. (Compl., P29 and Ex. 9; *admitted,* Trusts' Answer, P29)

Parcel 4, legally described in paragraph thirteen of the Complaint, is located at 23400 Road N, Cortez, Colorado and consists of seventeen acres of land. (Novotny Deposition, p. 337) Title to Parcel 4 was conveyed to the Novotnys on August 7, 1978 for the stated consideration of $10.00. (Compl., P31 and Ex. 11; *admitted,* Trusts' Answer, P31) The documentary fee stamp indicates that the purchase price was $16,000. (*Id.*)

Parcel 5, legally described in paragraph fourteen of the complaint, is located at 112 North Street E., Cortez, Colorado and consists of a 900–square foot house. (Novotny Deposition, pp. 342–43). Title to Parcel 5 was conveyed to the Novotnys on March 2, 1978 for the stated consideration of $10. (Compl., P33 and Ex. 13; *admitted,* Trusts' Answer, P33) The documentary fee stamp applied indicated that the purchase price was $19,000. (*Id.*)

Parcel 6, legally described in paragraph fifteen of the Complaint, is located at 26058 Highway 145, Cortez, Colorado and consists of forty acres of vacant land. (Novotny Deposition, pp. 348–49). Title to Parcel 6 was conveyed to the Novotnys on August 25, 1975 for the stated consideration of $10. (Compl., P35 and Ex. 15; *admitted,* Trusts' Answer, P35) The documentary fee stamp applied when the deed was recorded indicates that the purchase price was $56,000. (*Id.*)

Parcel 7, legally described in paragraph sixteen of the Complaint, is located at 29456 County Road U, Montezuma County, Colorado, and includes a small cabin. (Novotny Deposition, pp. 353–54). Title to Parcel 7 was conveyed to the Novotnys in a treasurer's deed on May 17, 1967.

(Compl., P37 and Ex. 17; *admitted,* Trusts' Answer, P37)

The Novotnys served as trustees for Midwest Limited for a brief period in 1979 and then from October 1985 to the present. (Deposition of Etta Novotny as Representative of Midwest Limited, p. 8; Deposition of Edward Novotny as Representative for Midwest Limited, p. 5; Trusts' Answer, Exs. 2 and 3) The Novotnys were trustees for Sunrise Investments for a brief period in 1979, and have served as the only trustees from October 1985 to the present. (Ed Novotny Deposition, pp. 226, 370; Trusts' Answer, Exs. 2 and 3) The Novotnys, as trustees, make all decisions concerning the use of the seven parcels of property, with the exception of Parcel 5 which is managed by Trustee Costello. (Deposition of Etta Novotny as Representative of Midwest Limited, pp. 45–47, 51–52) Other trustees have been appointed throughout the years, but none have been involved in the management of the Trusts. (Trusts' Answer, Exs. 2, 3; Declaration of Etta Novotny, P5; Etta Novotny Deposition, pp. 55–57) The Novotnys have acted as trustees of the Trusts, even when their names have not appeared on the Trust documents as trustees. (Etta Novotny Deposition, pp. 56–57; Deposition of Barbara Costello, p. 31)

Novotny has been the "manager" of Midwest Limited since 1979 and maintains and repairs the Trust properties. (Novotny Deposition, p. 242) Novotny has never received compensation from Midwest Limited for performing the services. (*Id.* at 242–243) Barbara Costello, who has been a trustee of Midwest Limited since 1993, manages Parcel 5 without receiving compensation. (Costello Deposition, pp. 9–13)

Prior to June 1, 1979, Edward and Etta Novotny resided on Parcel 3 and used approximately fifty acres of the land for Novotny's auto parts and salvage business. (Novotny Deposition, pp. 27–30, 77; Etta Novotny Declaration, P1) The Novotnys continued to live at their residence on Parcel 3 after the property was transferred to Sunrise Investments, with the exception of a two to three year period when the property was leased to a Mr. Zack. (Novotny Deposition, pp. 11–17) The Novotnys have not paid rent to Sunrise Investments for the use of the property, or made improvements to the property, other than regular maintenance and repairs. (*Id.* at pp. 331–332) In June 1979, Sunrise Investments entered into an agreement to lease Parcel 3 to Midwest Limited for $10 per year, but Midwest Limited has not paid any rent to Sunrise Investments for that parcel. (*Id.* at pp. 329, 334, and attached lease agreement) Novotny's auto salvage business has not paid rent to either Trust for the use of Parcel 3. (Novotny Deposition, pp. 127–130) Midwest Limited has never placed any limitations on the Novotnys' use of Parcel 3. (Etta Novotny Deposition, at pp. 46–48; Novotny Deposition, at pp. 335–337)

Parcel 2, consisting of two commercial buildings at 483 and 485 Broadway in Cortez, Colorado, is the main source of income for Midwest Limited. (Novotny Deposition, pp. 271–276) The buildings have been rented out over the years to various commercial enterprises. (*Id.* at pp. 275–76) The tenants are responsible for paying utilities in conjunction with their use of the buildings. (*Id.* at p. 284) Novotny managed the buildings on Parcel 2 before and after the property was transferred to Midwest Limited. (*Id.* at pp. 297–299) The monies generated from the building rentals are used to pay the property taxes and bills for the seven parcels of property. (*Id.* at pp. 340, 348, 352) Midwest Limited has never placed any limitations on the Novotnys' management of Parcel 2. (Etta Novotny Deposition, at pp. 46–48)

The Novotnys maintained Parcel 5 before Barbara Costello began managing the property in 1993. (Novotny deposition, p. 347) There is no evidence as to what use, if any, was made of Parcel 5 prior to 1993. Midwest Limited never placed any limitations on the Novotnys' management of Parcel 5. (Etta Novotny Deposition, at pp. 46–48) Costello uses Parcel 5 commercially as a place to train road crew flaggers. (Costello Deposition, p. 12) Costello does not pay rent to Midwest Limited for her use of Parcel 5, but has invested $6,000 to $7,000 of her own money to improve the building on the property. (*Id.* at pp. 13–14).

Novotny leases Parcel 6 to a cattleman for cattle grazing purposes. (Novotny deposition, pp. 349–350) The monies generated by Parcel 6 are used to pay the bills and taxes on the seven parcels of property. (*Id.* at p. 352) Midwest Limited has not placed any limits on the Novotnys' use of Parcel 6. (*Id.* at pp. 352–353)

Parcels 1 and 4 are undeveloped land. (Novotny Deposition, pp. 266–270, 337–339) Parcel 7 has a cabin on it and the Novotnys have picked plums from the trees on the property. (*Id.* at pp. 353–59) There is no evidence that the Novotnys have ever made any use of Parcels 1 and 4.

When Midwest Limited had a bank account, Novotny was one of three signatories on that account and authorized payment of Midwest Limited's bills. (Novotny Deposition, p. 434; Etta Novotny Declaration, P11) Kathy Novotny, the Novotnys' daughter, also had signatory authority on Midwest Limited's bank account. (Etta Novotny Declaration, P11) In recent years, Novotny stores the monies received from the rental of Parcels 2 and 6 in a box to pay the Trusts' property taxes and bills. (Novotny Deposition, pp. 111–112, and 333–334) The Trusts have not filed income tax returns, maintained financial statements, or made any distributions of principal or income to the designated beneficiaries. (*Id.* at 196–197; Sunrise Investment's Response to Requests for Admission, Government's Ex. 9, P2; Midwest Limited's Response to Requests for Admission, Government's Ex. 7, P2) Sunrise Investments has no income. (Novotny Deposition, p. 360; Deposition of Etta Novotny, p. 22) When Midwest Limited has not had enough money to pay its bills and property taxes, the Novotnys have advanced the funds to the Trust to pay them. (Deposition of Novotny as Representative of Midwest Limited, p. 61; Novotny Deposition, pp. 340, 388–89) The Novotnys did not charge interest to Midwest Limited when they advanced funds to the Trust. (Deposition of Novotny as Representative of Midwest Limited, pp. 110–11) All of the monies which the Novotnys have advanced to the Trusts have been repaid by the Trusts, with the exception of an outstanding $17,500 loan to Midwest Limited. (Deposition of Novotny as Representative of Midwest Limited, p. 109) The rental income generated from Parcels 2 and 6 has never been appropriated by the Novotnys for personal use. (Deposition of Novotny as Representative of Midwest Limited, pp. 110–111; Deposition of Etta Novotny as Representative of Midwest Limited, p. 53)

On August 5, 1983, the Novotnys transferred their Trust TCUs to Thelma Novotny, Novotny's mother. (Etta Novotny Declaration, P10; Trusts' Answer, Exs. 2 and 3) Thelma Novotny thereafter transferred the TCUs to the Novotnys' adult children in equal amounts on January 11, 1997. (Etta Novotny Declaration, P12; Trusts' Answer, Exs. 2 and 3) Thelma Novotny did not use the seven parcels of property after her name was placed on the TCUs. (Novotny Deposition, at pp. 368–369) Thelma Novotny did not receive any

distributions of principal or income from the defendant Trusts. (*Id.* at pp. 196, 369) The Novotnys' four adult children—Frank, Doug, Julie and Kathy—have been listed as the holders of the TCUs for Midwest Limited and Sunrise Investments since 1997. (Novotny Deposition, 405–431) The Novotnys' children have not been involved in the management or financial affairs of the Trusts. (*Id.* at pp. 420–21; Deposition of Frank Novotny, p. 16; Deposition of Douglas Novotny, pp. 8, 10; Deposition of Julie Fertsch, pp. 30, 51; Deposition of Kathy Lawrence, p. 32) None of the children have received any distributions from the Trusts and do not have any expectations that they will receive distributions. (Frank Novotny Deposition, pp. 10, 16; Douglas Novotny Deposition, pp. 8, 11; Fertsch Deposition, pp. 28–29; Lawrence Deposition, p. 32) Frank and Douglas Novotny are not aware that the Trusts own any property. (Frank Novotny Deposition, p. 9; Douglas Novotny Deposition, pp. 8, 10) Prior to their depositions for this case, Douglas Novotny, Julie Fertsch and Frank Novotny had not seen the trust certificates containing their names. (Douglas Novotny Deposition, pp. 9, 12; Frank Novotny Deposition, pp. 11–12, 15; Fertsch Deposition, pp. 26–27)

The United States had not assessed tax deficiencies against Novotny at the time the parcels of real property were transferred to the Trusts in 1979, nor had the State of Colorado assessed any tax deficiencies against Novotny at that time. (Etta Novotny Declaration, P9) Novotny was not rendered insolvent as a result of the property transfers. (*Id.*)

## II.

The purpose of summary judgment is to determine whether trial is necessary. *White v. York Int'l. Corp.*, 45 F.3d 357, 360 (10th Cir.1995). Summary judgment is appropriate under Fed.R.Civ.P. 56(c) when the "pleadings, depositions, answers to in-terrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The movant bears the initial burden to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.1992). If this burden is met, the non-movant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to [the nonmovant's claim]." *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) (internal citations omitted). The nonmovant has the burden to show that there are genuine issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Thomas v. International Business Machines*, 48 F.3d 478, 484 (10th Cir.1995). To defeat a properly supported motion for summary judgment, "there must be evidence upon which the jury could reasonably find for the plaintiff." *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Conclusory allegations will not create a genuine issue of material fact necessitating trial. *White*, 45 F.3d at 363.

## III.

### A. Claim to Reduce Tax Deficiency to Judgment

■ The Government argues that it is entitled to summary judgment on its first claim for relief against Novotny, to reduce to judgment unpaid federal income taxes for the 1989, 1990 and 1991 tax years in

the total amount of $100,684, statutory penalties assessed against Novotny for those tax years in the total amount of $31,890, and interest as allowed by law, because the certified Certificates of Assessments and Payments satisfy the Government's burden to establish the amount of federal taxes owed.

[redacted] The Government has sued Novotny to collect taxes resulting from unreported income. A presumption of correctness attaches to the Commissioner of Revenue's assessment if there is some evidence in the record to show that the taxpayer received unreported income. *United States v. McMullin,* 948 F.2d 1188, 1192 (10th Cir. 1991). The record shows that the IRS used the bank deposits method to calculate Novotny's income for the 1989 and 1990 tax years, and used the Consumer Price Index method to calculate Novotny's income for the 1991 tax year because Novotny chose not to file federal income tax returns for those years. (Government's Ex. 18, Attachments 1 and 2) Taxpayers are required to retain sufficient books and records from which their actual income can be determined. 26 U.S.C. § 6001; Treas. Reg. 1.6001–1(a). If a taxpayer's records are incomplete or inaccurate, the IRS is authorized to reconstruct his income in accordance with any reasonable method that accurately reflects actual income. 26 U.S.C. § 446; *Jones v. Comm'r of Revenue,* 903 F.2d 1301, 1303 (10th Cir.1990); *Palmer v. United States,* 116 F.3d 1309, 1312 (9th Cir.1997); *see, also, Dodge v. Comm'r of Revenue,* 981 F.2d 350, 353 (8th Cir.1992) (holding that IRS acted reasonably in reconstructing taxpayer's income from bank deposits); *Moore v. Comm'r of Revenue* [84–1 USTC ¶ 9129], 722 F.2d 193, 196 (5th Cir.1984) (holding that IRS acted reasonably in projecting taxpayer's income based on increases reflected in the Consumer Price Index).

The Notices of Deficiency for the 1989 and 1990 tax years reflect that Novotny received unreported income for interest, dividends, bank deposits, and capital gains. (Government's Ex. 18, Attachment 1) The Notice of Deficiency for 1989 also shows that Novotny received income from the sale of inventory in the amount of $201,400. (*Id.*) The Notice of Deficiency for the 1991 tax year shows that Novotny received income from interest, dividends, capital gains and self-employment income. (*Id.,* Attachment 2) Novotny admits that he received substantially all of the monies identified as "income" in the Government's Notices of Deficiency for the 1989, 1990 and 1991 tax years, but denies that any of the monies received were from capital gains, interest payments, or the "sale" of inventory. (Novotny's Answer to United States' Requests for Admissions, Government's Ex. 19). Further, it is undisputed that Novotny sold all or most of his auto salvage business to Copperstate Metals in 1989.

I find that the United States has met its burden to produce some evidence to support the tax deficiency assessments against Novotny for the 1989, 1990 and 1991 tax years. Accordingly, a presumption of correctness attaches to the Government's certified Certificates of Assessments and Payments against Novotny for those tax years.[3]

3. The certified Certificates of Assessments and Payments ("Form 4340") (Government's Exs. 11, 12 and 13) are presumptive proof that the assessments were made in the manner prescribed by 26 U.S.C. § 6203 and Treas.Reg. 301.6203–1. *Long v. United States* [92–2 USTC ¶ 50,431], 972 F.2d 1174, 1181 (10th Cir. 1992).

Additionally, the government's Form 4340 is presumptive proof that the government has satisfied the notice and demand requirements of 26 U.S.C. § 6303. *See Geiselman v. United States* [92–1 USTC ¶ 50,200], 961 F.2d 1, 6 (1st Cir.1992) (holding that certified Form 4340 which listed "first notice" dates for each tax assessment constitutes presumptive proof

Because the Government has demonstrated that it is entitled to the presumption that valid tax assessments were made, the burden shifts to Novotny to overcome the presumption by presenting admissible evidence which refutes the fact or amount of the assessments. *Long* [92–2 USTC ¶ 50,431], 972 F.2d at 1181; *United States v. Gosnell* [92–2 USTC ¶ 50,368], 961 F.2d 1518, 1519 (10th Cir.1992) (quoting *Jones v. Comm'r of Revenue* [90–1 USTC ¶ 50,-280], 903 F.2d 1301, 1303 (10th Cir.1990)).

Novotny is proceeding *pro se*. He first argues, to no avail, that he is not subject to the federal income tax. The arguments which Novotny advances in support of his position have been soundly rejected by the courts. *See Lonsdale v. United States* [90–2 USTC ¶ 50,581], 919 F.2d 1440, 1448 (10th Cir.1990); *Charczuk v. Comm'r of Revenue* [85–2 USTC ¶ 9656], 771 F.2d 471, 472–474 (10th Cir.1977) (citing *Ficalora v. Comm'r of Internal Revenue* [85–1 USTC ¶ 9103], 751 F.2d 85 (2d Cir.1984)).

■ Novotny next asserts that he is not liable for any income tax for the years 1989, 1990 and 1991 because his profit and loss statements show that he suffered a loss for each of those tax years. (*See* Exs. 47–49 to Novotny's Response to United States' Motion for Summary Judgment ("MSJ"); Ex. A to Declaration of Etta Novotny, attached to defendant Trusts' Opposition to United States' MSJ) Specifically, Novotny maintains that: (1) the Government did not allow him the correct amount in business expense deductions for the tax years 1989, 1990, and 1991; (2) the Government did not deduct his costs when it established his basis in the cars sold to Copperstate Metals when calculating No-

votny's income for the 1989 tax year; and (3) the Government taxed him up to eight times on the same income.

■ Novotny bears the burden to demonstrate that he is entitled to the claimed business expense deductions, *See INDOPCO, Inc. v. Comm'r of Revenue* [92–1 USTC ¶ 50,113], 503 U.S. 79, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992); *Hradesky v. Comm'r of Revenue* [CCH Dec. 33,461], 65 T.C. 87, 90, 1975 WL 3047 (1975), *aff'd per curiam* [76–2 USTC ¶ 9703], 540 F.2d 821 (5th Cir.1976); *Ashley v. Comm'r of Revenue* [CCH Dec. 54,-151(M) ], 80 TCM 841, 2000 WL 1839373 (2000). Similarly, Novotny must prove his cost basis in property; otherwise, the basis of property is deemed to be zero. *G.M. Leasing Corp. v. United States* [75–1 USTC ¶ 9435], 514 F.2d 935, 941 (10th Cir.1975), *aff'd in part and rev'd in part on other grounds* [U.S. 338, 77–1 USTC ¶ 9140], 429, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977) (citing *Factor v. Comm'r of Revenue* [60–2 USTC ¶ 9551], 281 F.2d 100 (9th Cir.1960)); *Irwin H. Bard* [CCH Dec. 46,-800(M) ], 90[60] TCM 431, pp.2088–90.

The United States argues that Novotny's profit and loss statements are inadmissible hearsay because the documents do not satisfy the business records exception under Fed.R.Evid. 803(6).[4]

Novotny must proffer admissible evidence to refute the presumption that the United States' tax assessments against him are valid. *Long* [92–2 USTC ¶ 50,-431], 972 F.2d at 1181; Fed.R.Civ.P. 56(e). Because the profit and loss statements submitted by Novotny are hearsay under Fed.R.Evid. 801, they are inadmissible un-

---

that the IRS provided notice and made demand for payment to the taxpayer); *see also, United States v. Chila* [89–1 USTC ¶ 9299], 871 F.2d 1015, 1019 (11th Cir.1989).

4. Fed.R.Evid. 803(6) provides an exception to the hearsay rule for records kept in the course of a regularly conducted business activity, made contemporaneous to the time of the events, as shown by the testimony of a qualified witness.

less an exception to the hearsay rule applies. Fed.R.Evid. 802. The record shows that Novotny's profit and loss statements for the tax years 1989, 1990 and 1991 were not maintained in the course of a regularly conducted business activity, but were instead prepared by Etta Novotny sometime after July 2000 in response to a specific request from Government counsel. (Declaration of Etta Novotny, P17) The business records exception set forth in Fed. R.Evid. 803(6) does not apply. The profit and loss statements will be excluded because Novotny has not demonstrated that they are admissible under any exception to the hearsay rule.

■ Even if the profit and loss statements are admissible, Novotny did not provide the Government with any corroborating records to substantiate his claims regarding his cost basis in the cars sold to Copperstate Metals in 1989. Novotny's uncorroborated and self-serving profit and loss statements are insufficient to overcome the presumption of correctness afforded the determinations of the Commissioner. *See Mays v. United States* [85–2 USTC ¶9490], 763 F.2d 1295, 1297 (8th Cir.1985). Novotny contends that he sold 2,600 vehicles as scrap metal in 1989 which were purchased at an average price of $125 per vehicle (totaling $325,000 for the cost of goods sold); however, he has not produced any supporting records to verify that he sold 2,600 vehicles to Copperstate Metals, other than his own recollection (Novotny Deposition, p. 83), or any records to substantiate his calculated figure of $125 to purchase each vehicle. Novotny has also failed to proffer substantiating records to establish how the costs of goods were allocated, or whether such allocation was proper in order to refute the Government's determination that he received $201,400 from the sale of scrap metal. Novotny's profit and loss statements reflect that he deducted the entire cost of each vehicle from the price he received when

the cars were sold to Copperstate Metals as scrap metal. The scrap metal sold to Copperstate was acquired from cars which had been accumulating in Novotny's salvage yard since 1957. (Novotny Deposition, p. 124) Parts from most of the cars had been sold by Four Corners over the years prior to the 1989 sale. (Novotny as Representative of Midwest Limited deposition, pp. 71–72, 86) Novotny may not deduct the entire cost of each vehicle from the amount he received from the sale of the cars to Copperstate Metals in 1989 without taking into account the fact that he sold parts from many of the vehicles over the years. I find that Novotny has failed to provide corroborating documentation to establish his claimed basis in the cars sold to Copperstate Metals in 1989; thus, Novotny has failed to raise a genuine issue of material fact about the correctness of the Government's certified Certificates of Assessments and Payments for 1989 which assign Novotny $201,400 in income for the sale of inventory and a presumed zero basis in that inventory.

■ Novotny next argues that the Government did not allow him the correct amount in business expense deductions for the tax years 1989, 1990, and 1991. Novotny maintains that eighty-six percent of the monies he received in those years should have been deducted as business expenses. (*See* Novotny's Answer to United States' Interrogatories, Government's Ex. 17, attachment, p. 186) Novotny did not provide the Government with any documentation to substantiate his assertion until on or about April 11, 2001. Novotny then produced to the United States bank statements, cancelled checks and ledger pages for the Four Corners Auto Parts & Salvage business for the tax years 1989, 1990 and 1991, in response to a court order granting the United States' Motion to Compel [filed February 22, 2001]. *See*

"Respondent['s] ... Response to Courts Order to Compel Certain Answers and Copies of Checks to Support Private Profit and Loss Statement." I find that the records produced by Novotny in April 2001 provide some evidence of Novotny's expenses for the tax years 1989 through 1991 sufficient to create a genuine issue of material fact on the issue of whether Novotny is entitled to additional business expense deductions for those tax years which would require a reduction in the taxable income attributed to Novotny in the Government's certified Certificates of Assessments for those tax years.

Finally, Novotny argues that he was taxed up to eight times on the same income, but he has not provided any documentation or expert testimony to support his assertions. Novotny's unsubstantiated claim is insufficient to create a genuine issue of material fact about the correctness of the Government's certified Certificates of Assessments and Payments for 1989, 1990 and 1991.

■ Novotny was also assessed statutory additions for the 1989, 1990 and 1991 tax years under 26 U.S.C. § 6651(a)(1) for failure to file tax returns on time without reasonable cause, and under 26 U.S.C. § 6654 for underpayment of estimated taxes. (Government's Ex. 18, Attachments 1 and 2) Novotny does not dispute that he did not pay his taxes in a timely manner or that he failed to make estimated tax payments for the years in question. Further, Novotny has not demonstrated reasonable cause for his failure to file timely tax returns for the 1989, 1990 and 1991 tax years. Novotny is thus liable for statutory additions under 26 U.S.C. § 6651(a)(1) and § 6654. The penalty assessments reflected in the Government's certified Certificates of Assessments and Payments were determined from Novotny's calculated income tax liability and are based on a percentage of that tax liability. 26 U.S.C.

§ 6651(a)(1) and § 6654. Because I have determined that a genuine issue of material fact exists as to the correctness of the Government's income tax deficiency assessments against Novotny, based on possible business expense deductions to which Novotny may be entitled, I also find that a genuine issue of material fact exists as to the correctness of the assessed statutory penalties for the 1989, 1990 and 1991 tax years.

In sum, I find that Novotny has failed to meet his burden to demonstrate that genuine issues of material fact exist as to the correctness of the tax deficiency assessments reflected in the Government's certified Certificates of Assessments and payments for the 1989, 1990 and 1991 tax years, excepting the issue of whether Novotny is entitled to additional business expense deductions for those tax years. Because of the existence of that single issue of disputed material fact, I deny the United States' Motion for Summary Judgment on Claim One.

B. *Can the United States foreclose its federal tax liens against the seven parcels of real property to satisfy Novotny's federal tax liabilities?*

■ In Claim Two, the United States seeks to foreclose its federal tax liens against the seven parcels of real property to which the Trusts hold paper title on the ground that the Novotny's purported conveyances of the properties to the Trusts were ineffective to convey legal title to the Trusts under Colorado law. In Claims Three through Six, which are pleaded in the alternative to Claim Two, the United States seeks to foreclose its tax liens under the theories that the Trusts hold legal title to the properties as the nominees of Edward Novotny, that the Trusts are the alter egos of Novotny, or that the Trusts are sham trusts, and, therefore, Novotny

retains a beneficial interest in the Trust properties.

■ "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount ... shall be a lien in favor of the United States upon all property and rights to property, whether real or personal belonging to such person." 26 U.S.C. § 6321. The federal tax lien arises automatically when (1) assessment has been made in accordance with 26 U.S.C. § 6203; (2) the taxpayer has been given notice that states the amount of the assessment and demands payment under 26 U.S.C. § 6303(a); and (3) the taxpayer has failed to pay the amount assessed. *See Egbert v. United States* [91–1 USTC ¶ 50,048], 752 F.Supp. 1010, 1015 (D.Wyo. 1990), *aff'd, United States v. Egbert,* 940 F.2d 1539, 1991 WL 150859 (10th Cir. 1991); *Guthrie v. Sawyer* [92–2 USTC ¶ 50,391], 970 F.2d 733, 735 (10th Cir.1992). The lien attaches at the time the assessments are made and continues until the liability is extinguished. 26 U.S.C. § 6322; *United States v. Cache Valley Bank* [89–1 USTC ¶ 9157], 866 F.2d 1242, 1244 (10th Cir.1989) (internal citation omitted). Here, the tax liens against Novotny's property and rights to property arose when the IRS made tax deficiency assessments against Novotny for the 1989 and 1990 tax years in May 1993, and for the 1991 tax year in November 1994.

■ It is well settled that "state law controls in determining the nature of the legal interest which the taxpayer had in the property ... sought to be reached by the [federal revenue act]." *Aquilino v. United States* [60–2 USTC ¶ 9538], 363 U.S. 509, 513, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960) (quoting *Morgan v. Commissioner* [40–1 USTC ¶ 9210], 309 U.S. 78, 82, 60 S.Ct. 424, 84 L.Ed. 585 (1940)); *see, also, United States v. Mitchell* [71–1 USTC ¶ 9451], 403 U.S. 190, 197, 91 S.Ct. 1763, 29 L.Ed.2d 406 (1971) (citations omit-

ted); *Gardner v. United States* [94–2 USTC ¶ 50,482], 34 F.3d 985, 987 (10th Cir.1994). "The statutory language 'all property and rights to property,' appearing in § 6321 [and in § 6331(a) and § 6332(a) ], is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." *United States v. National Bank of Commerce* [85–2 USTC ¶ 9482], 472 U.S. 713, 719–20, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985) (internal citation omitted). Federal law controls "the ultimate issue of whether a taxpayer has a beneficial interest in any property subject to [lien] for unpaid federal taxes." *Drye v. United States* [99–2 USTC ¶ 51,006; 99–2 USTC ¶ 60,363], 528 U.S. 49, 57, 120 S.Ct. 474, 145 L.Ed.2d 466 (1999) (citing *Morgan* [40–1 USTC ¶ 9210], 309 U.S. at 80, 60 S.Ct. 424) ("State law creates legal interests and rights. The federal revenue acts designate what interest or rights, so created, shall be taxed.") Once the taxpayer's legal interest in the property is determined, the federal tax consequences that attach to that interest are a matter of federal law. *United States v. Bess* [58–2 USTC ¶ 9595], 357 U.S. 51, 55, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958); *United States v. Rodgers* [83–1 USTC ¶ 9374], 461 U.S. 677, 683, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1982); *Gardner* [94–2 USTC ¶ 50,482], 34 F.3d at 987.

1. *Are the United States' claims barred by collateral estoppel?*

■ The Trusts argue that the United States is collaterally estopped from proceeding against the seven parcels of real property to satisfy the tax liabilities of Novotny by the Colorado Court of Appeals' decision in *Par Husan Ventures, et al. v. Thurl Boyd, et al. ("Par Husan"),* No. 97CA0948 (February 25, 1999) (not selected for publication) (attached as Ex. 1 to Trust Defs.' MSJ).

Colorado law determines the preclusive effect of a Colorado state court judgment. *United States v. Winchell,* 790 F.Supp. 245, 248 (D.Colo.1992) (citing 28 U.S.C. § 1738). In Colorado, collateral estoppel precludes relitigation of an issue that was actually litigated and necessarily adjudicated in a prior proceeding against a party to that proceeding, or someone who was in privity with a party, and the party against whom the doctrine is asserted had a full and fair opportunity to litigate. *Denver v. Consolidated Ditches Co.,* 807 P.2d 23, 32 (Colo.1991).

In *Par Husan,* the plaintiff trusts and individual family members affiliated with the trusts sought to quiet title to two tracts of real property conveyed to the trusts by the family members upon the creation of the trusts, and which had been sold by IRS auction to the defendants to satisfy the tax deficiencies of some of the family members. The state trial court ruled that the trusts were invalid under Wyoming law for lack of identifiable beneficiaries and that the conveyances of property to the trusts were consequently of no effect. (*Par Husan* decision, p. 2). The trial court thus concluded that the taxpayer's interests in the properties were effectively conveyed to the defendants in the tax sale. (*Id.* at pp. 2–3) The Colorado Court of Appeals reversed the trial court's ruling that the Trusts were invalid for lack of identifiable beneficiaries and held that the trust documents were sufficient to form valid trusts under Wyoming law. (*Id.* at pp. 5–11) The Court of Appeals then remanded the case to the trial court for further proceedings to determine ownership interests in the properties. (*Id.* at pp. 13–16)

The Trust defendants argue that because the trust documents which formed Midwest Limited and Sunrise Investments are virtually identical to the trust documents which the Court of Appeals upheld as valid in *Par Husan,* the United States is collaterally estopped from challenging the Trusts' ownership interests in the seven parcels of real property at issue.

I find that the Trusts' attempt to invoke the doctrine of collateral estoppel against the United States fails. First, the issues litigated and decided in *Par Husan* are not the same issues involved in the instant action. The Court of Appeals did not address or decide the issue of whether the trusts were the nominees or alter egos of the taxpayer, or were sham trusts. Even if the Colorado Court of Appeals had decided those questions as they pertained to the trusts involved in that case, the issues of whether Midwest Limited and Sunrise Investments are sham trusts, are the alter egos of Edward Novotny, or hold title to the seven parcels of real property as the nominees Novotny, were not litigated and decided in the *Par Husan* case, nor could they have been. Similarly, the issue of whether Sunrise Investments and Midwest Limited complied with Colorado statutory requirements for acquiring legal title to real property was not litigated or decided in *Par Husan.*

Second, the United States was not a party to the *Par Husan* case and there is no evidence that the United States was in privity with the *Par Husan* defendants. "Privity exists when there is a substantial identity of interests between a party and a non-party such that the non-party is 'virtually represented' in the litigation." *Public Service Co. v. Osmose Wood Preserving, Inc.,* 813 P.2d 785, 787 (Colo.App.1991). The identity of interests must be demonstrated by a "functional or working relationship" in which the non-party's interests are presented and protected by the party in litigation. *Id.* The Trusts argue that the *Par Husan* defendants represented the United States' interests in that case because the defendants purchased the

trust property at an IRS tax sale. This argument ignores the fact that the United States had sold its interest in the property when the *Par Husan* litigation commenced; thus, the United States did not have any interests to "represent" in that action. (Government Ex. 10. Affidavit of Robert A. Varra, PP3, 13) Even if the United States had any interests in the subject property, those interests were not presented or protected by the *Par Husan* defendants. The undisputed evidence shows that the IRS did not provide trial strategies or otherwise actively participate in the defense of *Par Husan.* (Varra Affidavit, PP3–12) The only participation by the IRS in the *Par Husan* suit was the subpoenaed lay witness testimony of IRS employees about the seizure and sale actions taken by the IRS against the taxpayers. (*Id.* at PP5–12)

I find that collateral estoppel does not preclude the United States from seeking to foreclose its tax liens against the seven parcels of real property titled to the Trusts.

2. *Were the conveyances of property to the Trusts in 1979 ineffective to convey legal title under Colorado law?*

■ The Government asserts, in Claim Two, that it is entitled to foreclose its tax liens against the seven parcels of property because the Novotnys' purported conveyances of those properties to the Trusts in 1979 were ineffective to convey legal title to the Trusts under COLO.REV.STAT. ("C.R.S.") § 38–30–166.

■ Colorado law applies to issues relating to the conveyance and ownership of real property located within Colorado.

*See* Restatement (Second) of Conflicts of Laws § 223 and comment g (1971).

C.R.S. § 38–30–166(1) states that a trust may acquire real property in the name of the trust upon compliance with subsection (2) which provides for the trustee to record an affidavit setting forth the name of the trust and the names and addresses of all the trustees with the county clerk and recorder of the county in which the property interest is located.

Parcels 3 and 7 were conveyed to Sunrise Investments on June 1, 1979. It is undisputed that none of the trustees of Sunrise Investments recorded an affidavit setting forth the name of the trust and the names and addresses of all the trustees on or before June 1, 1979, or at any time thereafter. (Compl., P39, *admitted,* Defendant Trusts' Answer, PP39–40) The United States argues that because the trustees of Sunrise Investments did not record the requisite affidavit, the conveyances to that Trust are null and void and the property is still owned by the Novotnys.

The Government contends that the conveyances of real property to Midwest Limited were also legally ineffective because Midwest Limited did not file an affidavit in compliance with C.R.S. § 38–30–166(1) and (2) until five years after the purported transfers and that affidavit is defective because it does not list the names of all trustees. (*See* Trusts' Answer, Ex. 12) The Government further argues that Midwest Limited has failed to comply with the statutory requirement that a new affidavit be filed each time the identity of the trustees changes. C.R.S. § 38–30–166(6).[5]

---

5. C.R.S. § 38–30–166(6) provides that in order for a trust to have acquired property before July 1, 1993, it must have complied with the statute as it existed prior to May 14, 1992. Before 1992, the statute required the trustees to record a new affidavit each time the identity of the trustees changed. *See* C.R.S. § 38–30–166 Historical and Statutory Notes.

The record shows that on January 29, 1985, the trustees of Midwest Limited recorded an affidavit with the Montezuma County Clerk and Recorder which listed Lowell Anderson and Pioneer Trust as trustees. (Trusts' Answer, Ex. 12) When the affidavit was recorded, Pioneer Trust was no longer a trustee of Midwest Limited, having resigned as trustee on June 7, 1984. (*Id.*, Ex. 2, Minutes of Midwest Limited dated June 7, 1984) A new trustee, Common Estates Company, was appointed on June 5, 1984. (*Id.*, Minutes of Midwest Limited dated June 5, 1984) Common Estates Company was not listed in the January 29, 1985 affidavit as a trustee. The Novotnys were appointed as trustees of Midwest Limited in October 1985 after Lowell Anderson and Common Estates Company resigned as trustees. (*see generally*, Defendant Trusts' Answer, Ex. 2) Midwest Limited did not file a new affidavit in October 1985 to reflect the appointment of the Novotnys as trustees.

The Trusts, relying on the Colorado Court of Appeals' unpublished decision in *Par Husan*, argue that C.R.S. § 38–30–166 is a notice statute and that conveyances of property to a trust are not void for failure to comply strictly with the statutory terms. The Trusts emphasize that the affidavit filed by Midwest Limited on January 29, 1985 substantially complies with the statutory requirements because the affidavit was signed and notarized on May 18, 1984, before Pioneer Trust resigned as trustee.

In *Par Husan*, the Colorado Court of Appeals held that C.R.S. § 38–30–166 is a notice statute and a failure to comply with its affidavit requirement which is subsequently corrected does not invalidate a prior conveyance to a trust. *Par Husan*, at p. 21. The Colorado Court of Appeals found that although the trustee had not filed the requisite affidavits prior to, or contemporaneous with, the conveyances of

real property to the trusts, the proper affidavits were filed well before the tax sale where the defendants purchased the property, so that defendants had adequate record notice that the property was owned by the trusts. (*Id.*)

The court has located only one published decision by a Colorado appellate court addressing the requirements of C.R.S. § 38–10–166. In *Oken v. Hammer*, 791 P.2d 9, 13 (Colo.App.1990), the Colorado Court of Appeals explained that the statute "provides for the ownership of property by a trust," and "provides a method of giving notice to parties that the property is part of a trust estate and establishes, as a public record, those individuals empowered to deal with the trust property." In *Oken*, the court held that the trustee's recording of the Certificate of Trust Existence and Authority, signed under oath by the trustee, which granted the trustee all powers which may be exercised by individuals owning property in their own right, satisfied the filing requirements of C.R.S. § 38–30–166(2) and established the trustee's authority to convey and encumber the subject property. *Id.* at p. 12.

*United States v. Winchell*, 790 F.Supp. 245, 247 (D.Colo.1992) (Babcock, J.) involved a dispute over property which Winchell had conveyed to a trust organization in 1979. One of the parties to the dispute attacked the conveyance to the trust under C.R.S. C.R.S. § 38–30–166. The court held that the statute must be strictly construed because it is in derogation of common law. *See Pigford v. People*, 197 Colo. 358, 593 P.2d 354 (Colo.1979). The court found that the trust in question had filed a facially defective affidavit because the affidavit was signed by a person who was not named as a trustee in the affidavit. 790 F.Supp. at 247. The court then held as a matter of law that the trust failed to acquire the real property conveyed to it in

1979 and voided the conveyances. *Id.* at 248. The court cited the Colorado Court of Appeals' statement in *Oken v. Hammer,* at p. 12, that a statute which is clear must be applied as written. *Winchell,* 790 F.Supp. at 248.

■■■ The Colorado Supreme Court has not addressed the issue of whether a facially defective affidavit can satisfy the requirements of C.R.S. § 38–30–166(2). In the absence of a statutory interpretation by the state's highest court, interpretational decisions of state intermediate appellate courts provide evidence of how the state's highest court would rule on the issue. *See Stauth v. National Union Fire Ins. Co. of Pittsburgh,* 236 F.3d 1260, 1267 (10th Cir.2001).

The *Oken v. Hammer* and *Par Husan* decisions did not specifically address whether a facially defective affidavit is sufficient to comply with C.R.S. § 38–30–166(2). *Par Husan* decided only that the filing of a late affidavit satisfied the notice requirements of the statute and thus did not operate to void a conveyance of property to the trusts several years earlier. There is no indication in the *Par Husan* decision that the late affidavit was facially defective. The only case to address the specific issue of a facially defective affidavit is the *Winchell* decision. Because the Colorado appellate courts have not addressed the specific issue before me, I will follow *Winchell.*

I construe the filing requirements of C.R.S. § 38–30–166 strictly and find that both Trusts have failed to comply with the statute. There is no evidence that Sunrise Investments has ever attempted to comply with the requirements of C.R.S. § 38–30–166. With regard to Midwest Limited, the evidence shows that the trust did record an affidavit approximately six years after title to Parcels 1, 2, 4, 5, and 6 were conveyed to it by the Novotnys, but the affidavit failed to name the correct trustees. Because there had been a change of trustee prior to the date Midwest Limited recorded its affidavit, the trust should have amended the affidavit to reflect the name of the new trustee, Common Estates Company, who was appointed after Pioneer Trust Company resigned. Further, Midwest Limited should have amended the affidavit again in October 1985 to reflect the appointment of the Novotnys as trustees. I find and conclude as a matter of law that the defendant Trusts do not hold legal title to the seven parcels of real property because they have failed to comply with Colorado's statutory requirements for trusts to hold legal title to real property.

■■■ Because title to Parcels 1, 2, 3, 4, 5, 6 and 7 was not legally conveyed to Sunrise Investments and Midwest Limited in 1979, the Novotnys remained the fee simple owners of those properties, unless the Trusts successfully establish, in their quiet title counterclaims, that notwithstanding their failure to acquire legal title in 1979, the Trusts subsequently became the owners of the properties pursuant to Colorado statutes which allow persons to establish ownership by possession. *See* Discussion, Section III.B.3, *infra.* In Section III.B.3, *infra,* I find that genuine issues of material fact exist on the Trusts' counterclaims to quiet title to the seven parcels in the Trusts; thus, the question of whether the Novotnys or one of the Trusts owned the subject properties when the Government's tax liens arose in 1993 and 1994 cannot be resolved on summary judgment. I must therefore deny the United States' motion for Summary Judgment on Claim Two.

3. *The Trusts' Counterclaims to Quiet Title*

■■■ The Trusts contend that they are entitled to summary judgment on their

counterclaims to quiet title to the seven parcels of property. The Trusts seek to establish their ownership of the property under C.R.S. § 38–41–108 or § 38–41–111(1).

C.R.S. § 38–41–108 provides that a party who is in actual possession of property for seven years under color of title and who pays the legally assessed taxes shall be deemed the legal owner of the real property to the extent of his title. Section 38–41–111(1) states:

No action shall be commenced or maintained against a person in possession of real property to question or attack the validity of or to set aside upon any ground or for any reason whatsoever any instrument of conveyance [or] deed . . . if such document has been recorded and has remained of record in the office of the county clerk and recorder of the county where said real property is situated for a period of seven years. All defects . . . or other grounds of invalidity . . . must be raised in a suit commenced within said seven year period.

Sections 38–41–108 and 38–41–111(1) can be asserted as a means to establish title to or the right of possession of real property. C.R.S. § 38–41–113; *see Childers v. Quartz Creek Land Co.*, 946 P.2d 534 (Colo.App.1997), *cert. dismissed*, 964 P.2d 509 (Colo.1998). An action to enforce or establish a right to real property must be commenced within eighteen years after the right to bring such action accrued. C.R.S. § 38–40–101(1). The Trusts' claims are timely under C.R.S. § 38–40–101(1) because the earliest their claims accrued was in June or August 1986, seven years after the Novotnys attempted to transfer title to the properties to the Trusts and the deeds were recorded.

 To establish ownership of the seven parcels under § 38–41–108, the Trusts must prove that at the time the IRS tax liens arose, the Trusts had been in actual and exclusive possession of the properties for a period of seven continuous years and paid the taxes on the properties during that time period. *See Peters v. Smuggler–Durant Mining Corp.*, 930 P.2d 575, 579–580 (Colo.1997); *Ginsberg v. Stanley Aviation Corp.*, 193 Colo. 454, 568 P.2d 35 (1977). To establish ownership of the properties under C.R.S. § 38–41–111(1), the Trusts must prove actual possession and that the deeds conveying the properties were properly recorded for a seven-year period. *See Ginsberg*, 568 P.2d at 38; *Calvat v. Juhan*, 119 Colo. 561, 206 P.2d 600 (1949). "Actual possession" means "physical occupancy or control over property." BLACK'S LAW DICTIONARY (7th ed.1999).

I find that the evidence does not establish, as a matter of law, that the Trusts physically occupied or controlled Parcels 1, 2, 3, 4, 5, 6 and 7. The pertinent evidence of record shows the following: Novotny has controlled the management of all properties both during his tenures as trustee, and during the period from 1979 through 1985 when he was not an appointed trustee. Novotny has managed Parcels 2 and 6 for the benefit of the Trusts. The evidence regarding Novotny's personal use of Parcels 1, 4, 5 and 7 was meager and inconclusive. There is no evidence that any use has been made of Parcels 1, 4 or 7. Parcel 5 has been managed by trustee Costello since 1993 and has been used for her personal business ventures, but there is no evidence about the use of Parcel 5 prior to 1993 when it was managed by Novotny.

With regard to Parcel 3, the evidence shows that after Parcel 3 was transferred to Sunrise Investments, Novotny continued to exercise control over the property which he uses solely for his and his wife's benefit, as their residence and for his auto salvage business. Novotny has never paid

rent to either Trust for his use of Parcel 3 as a residence and for his business. The Novotnys have not made any significant improvements to Parcel 3 in lieu of rent. Further, the Trusts have not placed any restrictions on the Novotnys' use of Parcel 3 and no other persons have exercised control over Parcel 3 since the property was conveyed to the Trusts. It is unclear from the record whether the Novotnys or the Trusts paid the property taxes on Parcel 3 and the utility bills for the Novotnys residence and business.

Genuine issues of material fact exist about whether the Trusts' have satisfied the "possession" element of C.R.S. § 38–41–108 or § 38–41–111(1) with respect to each parcel of real property. Issues of material issue of fact also exist as to whether the Trusts have paid the property taxes on Parcels 1, 2, 4, 5, 6 and 7 for the period required by C.R.S. § 38–41–108. I

therefore deny the Trusts' motion for summary judgment on their counterclaims to quiet title to Parcels 1, 2, 3, 4, 5, 6 and 7.[6]

### 4. The United States' Motion for Summary Judgment on Claims Three through Six to foreclose its federal tax liens

The United States also moves for summary judgment on Claims Three through Six, to foreclose its tax liens on the seven parcels of property because Novotny retains a beneficial interest in the properties under the theories of nominee, alter ego or sham trust. I do not address the Government's arguments in support of their motion for summary judgment on Claims Three through Six because my ruling on Claim Two, that the Novotnys failed to convey legal title to the Trusts in 1979, obviates the need for a ruling as to those claims. The theories of nominee, alter ego

**6.** The Trusts also assert, as an affirmative defense, that the United States' Claims Two through Six, to foreclose its tax liens which allegedly attached to the seven parcels of real property, are time-barred under the statutes of limitation provided for in C.R.S. § 38–8–110 § 38–41–108, and § 38–41–111(1).

The federal government argues that it is not subject to state statutes of limitations in enforcing sovereign rights absent clear Congressional intent to the contrary. *United States v. Summerlin* [40–2 USTC ¶ 9633], 310 U.S. 414, 417, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940) ("When the United States becomes entitled to a claim, acting it its governmental capacity and asserts its claim in that right, it cannot be deemed to have abdicated its governmental authority so as to become subject to a state statute putting a time limit upon enforcement.") (internal citation omitted); *Marshall v. Intermountain Electric Co., Inc.*, 614 F.2d 260, 262–63 (10th Cir.1980); *United States v. Christensen* [90–2 USTC ¶ 50,543], 751 F.Supp. 1532, 1536 (D.Utah 1990) (holding that the United States was not bound by the Utah statute of limitations for fraudulent conveyance actions in action to enforce federal tax lien), *appeal dismissed*, 961 F.2d 221 (10th Cir.1992).

The United States has brought this action to enforce its sovereign right to collect taxes. The only statutory time limitation applicable to the United States' foreclosure claims is the ten-year limitations period prescribed by 26 U.S.C. § 6502(a)(1) (stating that judicial actions to collect assessed tax liabilities must be commenced within ten years after the assessment is made). C.R.S. § 38–8–110, which establishes a limitations period on actions to set aside a fraudulent conveyance, is not even arguably applicable because the United States has not asserted a fraudulent conveyance claim.

C.R.S. § 38–41–108 and § 38–41–111(1) bar the United States' foreclosure claims against the subject properties only if the Trusts prove at trial that they were the owners of the properties at the time the Government's tax liens arose in 1993 and 1994 because they had established ownership of the properties in accordance with the statutory requirements. If the Trusts legally owned the properties at the time the tax liens arose, the IRS cannot reach the properties to satisfy Novotny's tax debts because Novotny did not have a beneficial interest in the properties under state law.

and sham trust are not applicable because the Novotnys' purported conveyances of the properties to the Trusts in 1979 did not convey legal title to the Trusts.

## IV.

Accordingly, it is

**ORDERED** that the United States' Motion for Summary Judgment [originally filed on December 22, 2001] is **DENIED.** It is

**FURTHER ORDERED** that Defendants Midwest Limited and Sunrise Investments' Motion for Summary Judgment [filed September 28, 2000] is **DENIED.**